# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

EDWARD ELLSWORTH              )
                                 )
      **Plaintiff,**             )
                                 )
**v.**                               )     **Case No.  3:08-cv-0647**
                               )     **Judge Trauger**
**POT LUCK ENTERPRISES, INC., d/b/a** )
**ASHLEY FURNITURE HOMESTORES,**   )
                               )
      **Defendant.**            )

## MEMORANDUM

Pending before the court is the Motion for Summary Judgment filed by the defendant, Pot Luck Enterprises, Inc., d/b/a Ashley Furniture Homestores (Docket No. 17), to which the plaintiff has responded (Docket No. 21), and the defendant has replied (Docket No. 23).  For the reasons discussed herein, the defendant's motion will be granted in part and denied in part.

## BACKGROUND

Edward Ellsworth, an African-American man and the plaintiff in this matter, was employed as a furniture sales associate for the defendant, Pot Luck Enterprises, Inc., d/b/a Ashley Furniture Homestores ("Ashley Furniture").[1]  Ellsworth began working at Ashley Furniture in April 2007 and resigned, approximately six months later, in October 2007.  As a sales associate, Ellsworth's primary duty was to assist customers on the sales room floor.  At

---

[1]Unless noted otherwise, the facts are drawn from the Plaintiff's Response to Defendant['s] Statement of Material Facts (Docket No. 23), as well as the depositions and other exhibits submitted by the parties.

1

times, multiple sales associates would work together on the floor, and all associates would work together on the floor on weekends. Ashley Furniture compensated sales associates based on a Master Commission Agreement and a Furniture Protection Bonus Plan, which guaranteed that associates would receive minimum wage as well as certain commissions and bonuses and described the limitations on those commissions and bonuses.

Ellsworth contends that, during his employment with Ashley Furniture, he repeatedly was subject to sexual and racial harassment. Ellsworth was initially propositioned for sex by certain of his co-workers approximately six weeks after he began his employment at Ashley Furniture and continued to be propositioned until he resigned. The propositions came from three of his co-workers, Michael Cressman, Charles Ftacek, and Greg Napper, all of whom are openly homosexual and were engaged in sexual relationships with each other. Ellsworth testified that, over a period of four and one-half months, the three men propositioned him six to eight times. At some point, he informed them that he was not homosexual and was not interested in any sexual encounter. According to Ellsworth, after he rejected their propositions, the men continued propositioning him, but did so in a more open, joking manner.

Also after Ellsworth rejected the propositions, Cressman, Ftacek, and Napper began making crude sexual comments about Ellsworth. While the three men made sexual comments, jokes, and innuendos among themselves on a daily basis, they began making comments to or about Ellsworth three to four times per week. According to Ellsworth, typically, the commentary would begin with a sexually-focused conversation among the three men and then expand to encompass talking to or about other people. The men's verbal conduct with respect to Ellsworth included explicit, racially-stereotyped speculations on the size of Ellsworth's genitalia and

2

sexual abilities and general comments about homosexual behavior.[2]  Ellsworth testified that the

commentary and propositions continued until his resignation in October 2007.

In addition to the racial nature of some of the sexual commentary, Ellsworth states that he

was also subject to racial harassment.  According to Ellsworth, Ftacek used the "n-word" in a

sexual context when referring to Ellsworth, Ellsworth's genitalia, or African-Americans' sexual

attributes in general.[3]  Furthermore, Johnie Young, an African-American employee, used the "n-

word" on multiple occasions in a non-sexual context because he was jealous of Ellsworth's sales

success.  Ellsworth testified that, in one incident, Young became upset about a certain sale and

shoved Ellsworth, called him the "n-word" repeatedly, and threatened to "do all kinds of things,"

including beating and killing Ellsworth.  According to Ellsworth, several weeks later, Young

said to Ellsworth, "[n-word], I can't stand you."  Young would also occasionally mutter

comments, some including the "n-word," under his breath in Ellsworth's presence, and "a lot of

antagonism" existed between Young and Ellsworth.

In addition to his allegations about Ftacek's and Young's use of racially offensive

language, Ellsworth also alleges that Don Adcock, a store manager, referred to certain furniture

as "being ghetto" and "for people in the 'hood" at a store sales meeting attended by employees

---

[2]Ellsworth testified, "there were so many comments – I mean, there were comments of, 'Well, I bet your penis is the size of an elephant trunk. I hear black guys have big penis[es]. I bet you do it real good.' Just – just all sorts of generalized comments about the size of my penis and propositioning me to have sex with them during lunch periods . . . talking about . . . they bet that my penis is down the side of my leg, that it's as big as an elephant's trunk . . . and all sorts of just derogatory comments concerning the size of my penis in [racially] stereotypical comments."

[3]Ellsworth testified that Ftacek used the "n-word" in conjunction with some, but not all, of the sexual comments.  It was "initially done jokingly when he was talking about my penis and the size of it or generally about black people's penises. . .  'Yeah, [n-words] got large penises,' and things like that.  I mean, it's something that took place frequently. . . [and was] very offensive to me racially."

and a sales manager. Ellsworth states that several employees laughed at Adcock's statements, which Ellsworth found offensive because "the general connotation for that is that it's meant for black people who have less of a socioeconomic standing." Ellsworth also testified that, at other times, he observed Adcock "laugh[ing] off" comments of a racial nature, "which kind of set the tone for that sort of behavior to be expected."

Ellsworth states that, over a period of one to three months, he complained multiple times about the sexual and racial harassment he experienced.[4] He testified that he spoke with Robert Ross and Jim Palmer, the sales managers; Don Adcock, the store manager; Johnny Hunter, the regional manager; and Tony Gallatin and Dan Parrish, whom Ellsworth describes as the owners of the store.

With respect to the racially offensive conduct, Ellsworth reports speaking to Ross and Palmer at least twice, and to Hunter once. After Young first used the "n-word" while allegedly shoving and threatening Ellsworth, Ellsworth reported the incident to Ross. Ellsworth states, "[Ross] said he would talk to Young, because it had gotten physical, that they would certainly have to do something about that . . . ." Ross required Young to apologize to Ellsworth, and Young did so later that week. Ellsworth reports that, when Young used the "n-word" again, he complained to both Ross and Palmer. Ellsworth testified, "I believe they talked to [Young] about it because the first incident got physical . . . but I'm not sure." Ellsworth claims that he also complained to Hunter about the second incident in which Young used the "n-word." Young did not apologize again, and his muttered remarks continued.

---

[4]Ashley Furniture disputes that Ellsworth complained about either form of harassment. Ashley Furniture only acknowledges that it received complaints when Young initially called Ellsworth the "n-word" and, after Ellsworth's resignation, through the Equal Employment Opportunity Commission ("EEOC").

Apart from his complaints about Young's racially offensive conduct, Ellsworth asserts that he repeatedly complained to Ashley Furniture about the propositions and sexual comments made by Cressman, Ftacek, and Napper. According to Ellsworth, he initially complained when the sexual commentary and propositions continued after he had rejected the propositions of the three men. Ellsworth states that he first complained about the sexual harassment to Ross and, then, in a separate conversation on the same day, to Palmer, both of whom said they would speak with Cressman, Ftacek, and Napper. Ellsworth is unsure if they did so but testified that, in any event, the comments continued. Ellsworth reports making a total of five or six complaints to Ross and Palmer within one or two months, and also making a complaint to Adcock. Ellsworth described one of his meetings with Palmer as "somewhat of a lengthy conversation," but stated that, otherwise, most of the conversations lasted for approximately five minutes. Ellsworth testified that, during the longer conversation, Palmer stated that Ellsworth was being targeted because of his sales success, and Palmer "reduced some things to writing" regarding the harassment that Ellsworth had experienced.

According to Ellsworth, his complaints to his managers did not stop the sexual propositions and commentary. He testified that the managers "were physically there during a lot of it and nothing took place. . . . they were kind of acquiescing in it." Thus, Ellsworth next approached Hunter to complain about the conduct, telling Hunter about the specific sexual comments and his previous unsuccessful complaints, and identifying Cressman, Ftacek, and Napper. Hunter told Ellsworth that, while he had heard about the complaints, he did not realize the situation was that serious and stated that he would "deal with it." Ellsworth is unsure whether Hunter spoke with anyone or took steps to "deal with" the problem. Ellsworth states

that Hunter may not have done anything because "Mr. Hunter was pretty close friends with Mr. Ftacek," and the sexual commentary continued.

Next, Ellsworth claims he approached Gallatin and Parrish, the store owners. According to Ellsworth, he first complained to Gallatin about the sexual commentary generally and provided the names of the three responsible individuals. Ellsworth does not recall Gallatin's response but felt that Gallatin was not taking the allegations seriously, because he "belittled" the allegations and did not say that he would do anything about them. Ellsworth left the meeting with "the general impression that nothing would be done about it." Ellsworth states he then went directly to Parrish's office and complained about the sexual harassment. Ellsworth testified that "Parrish's response was, verbatim, I 'need to go wear out some more shoe leather.'" Ellsworth interpreted Parrish's response to mean that Parrish did not care about the harassment and wanted Ellsworth to get back to work on the sales floor. After that, Ellsworth felt "[t]hey were pretty much condoning the behavior from the upper levels on down," and he resolved to leave his job.

Finally, Ellsworth alleges that, while he was employed at Ashley Furniture and after he complained about the harassing conduct he experienced, Ross withheld Ellsworth's commissions when Ellsworth made a sales error. Ellsworth alleges that this was in retaliation for his complaints. Although such withholdings are permitted by the Master Commission Agreement, Ellsworth testified that Ross did not withhold other sales associates' commissions when they made similar errors. Ellsworth further alleges that, in addition to the commissions withheld because of sales errors, other commissions were withheld inexplicably. Ellsworth resigned in late October and filed a complaint with the EEOC in December.

## ANALYSIS

Ellsworth brings claims under Title VII of the Civil Rights Act of 1965, 42 U.S.C. § 1983, and the Tennessee Human Rights Act, asserting that he was subject to a hostile work environment based on sex and race, and retaliation. Ellsworth also asserts that Ashley Furniture breached his employment contract by failing to pay his sales commissions. Ashley Furniture has moved for summary judgment with respect to Ellsworth's claims.

## I.      Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary

judgment as a matter of law.  *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir.

1999).  To preclude summary judgment, the nonmoving party "must go beyond the pleadings

and come forward with specific facts to demonstrate that there is a genuine issue for trial."  *Chao*

*v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002).  "The mere existence of a scintilla of

evidence in support of the [nonmoving party's] position will be insufficient; there must be

evidence on which the jury could reasonably find for the [nonmoving party]."  *Shah v. Racetrac*

*Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252).  If the

evidence offered by the nonmoving party is "merely colorable," or "not significantly probative,"

or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for

summary judgment should be granted.  *Anderson*, 477 U.S. at 249-52.  "A genuine dispute

between the parties on an issue of material fact must exist to render summary judgment

inappropriate."  *Hill v. White*, 190 F.3d 427, 431 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at

247-49).

## II.      Hostile Work Environment Claims

Both Title VII and the Tennessee Human Rights Act protect against discrimination on the

basis of race and sex.[5]  To establish a hostile work environment claim, Ellsworth must

demonstrate that (1) he is a member of a protected class; (2) he was subject to unwelcome

harassment; (3) the harassment was based on his status as a member of a protected class; (4) the

harassment affected a term, condition, or privilege of employment; and (5) Ashley Furniture

---

[5]Tennessee law provides that claims under the Tennessee Human Rights Act are analyzed according to the same standards that govern claims brought under Title VII.  *See, e.g.*, *Tetro v. Elliot Popham Pontiac, Oldsmobile, Buick & GMC Trucks, Inc.*, 173 F.3d 988, 993 (6th Cir. 1999) (citing *Campbell v. Fla. Steel Corp.*, 919 S.W.2d 26, 31 (Tenn. 1986)).  The following analysis therefore applies equally to Ellsworth's claims under federal and state law.

knew or should have known about the harassment and failed to take corrective or preventative action. *See Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009).

### A.    Sexual Harassment

With respect to Ellsworth's sexual harassment claim, Ashley Furniture contends that Ellsworth cannot establish that he is a member of a protected class or that the harassment he experienced was based on this membership.

In support of its argument, Ashley Furniture relies on *Vickers v. Fairfield Medical Center*, 453 F.3d 757, 765 (6th Cir. 2006), in which the Sixth Circuit Court of Appeals held that Title VII does not protect against discrimination based on sexual orientation.[6]  However, in 1998, the Supreme Court ruled that Title VII permits sexual harassment suits brought by plaintiffs regarding harassers of the same sex in certain situations.  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998).  Such same-sex harassment claims may be brought in three circumstances: (1) when the harassing conduct is motivated by sexual desire; (2) when the conduct is the result of a general hostility to a certain sex in the workplace; or (3) when a plaintiff offers comparative evidence about differential treatment in a mixed-sex workplace.[7]

---

[6]In *Vickers*, the plaintiff brought a claim alleging harassment based on both sexual orientation and his failure to conform to gender stereotypes (sex-stereotyping).  *See Vickers*, 453 F.3d at 765 (citing *Bibby v. Phila. Coca-Cola Bottling Co.*, 260 F.3d 257, 265 (3d Cir. 2001)). The Sixth Circuit ruled that a plaintiff who was harassed because of his perceived homosexuality did not have access to a sex discrimination claim under Title VII.  *Id.* at 763-64.  Further, although Title VII permits sex-stereotyping claims, the court held that the plaintiff failed to demonstrate that, while at work, he did not conform to traditional gender stereotypes in manner or appearance.  *Id*.  *Vickers* clarified that "a gender stereotyping claim should not be used to bootstrap protection for sexual orientation into Title VII."  *Id.* at 764 (quoting *Dawson v. Bumble & Bumble*, 398 F.3d 211, 218 (2d Cir. 2005)).

[7]Contrary to Ashley Furniture's assertion, a same-sex harassment claim is available if any one of these circumstances apply; a plaintiff need not prove that all three approaches are relevant

*See id.* at 80-81. Regardless of which of these three circumstances applies, the plaintiff must always prove that the conduct was not merely tinged with offensive sexual connotations, but actually constituted "discrimination . . . because of sex." *Id.* at 80-81.

In *Oncale*, the Supreme Court noted that courts infer that harassment is based on sex when conduct involves explicit or implicit proposals of sexual activity between members of the opposite sex. *See id.* at 80. "The same chain of inference would be available to a plaintiff alleging same-sex harassment, if there were credible evidence that the harasser was homosexual." *Id.* The Supreme Court's ruling in *Oncale* is consistent with a previous Sixth Circuit ruling holding that, if a male propositions another male because of sexual attraction, there is a presumption that the behavior is a form of harassment that occurs because of sex. *See Yeary v. Goodwill Indus.-Knoxville, Inc.*, 107 F.3d 443, 448 (6th Cir. 1997). Further, after *Oncale*, the Sixth Circuit ruled that, when a same-sex harasser is homosexual, a court may conclude that the harassment would not have been directed at both sexes, and, thus, is based on sex. *See E.E.O.C. v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 522 (6th Cir. 2001) (Guy, J., concurring in part and dissenting in part, and providing the opinion of the court with respect to the same-sex harassment claim).

*Vickers* is consistent with *Oncale* and other cases permitting same-sex sexual harassment suits, because the permissible claims under *Oncale* arise from discrimination that is based on sex, rather than on sexual orientation. *See Oncale*, 523 U.S. at 80-81; *Vickers*, 453 F.3d at 764. Although sexual orientation is not a basis for a Title VII claim, sexual orientation does not prevent a plaintiff from asserting an otherwise-valid sex discrimination claim where the harasser

to his case.

happens to be of the same sex.  *See Smith v. City of Salem*, 378 F.3d 566, 574-75 (6th Cir. 2004).

Moreover, sexual orientation can contribute to a *prima facie* case of sex discrimination to the

extent that the homosexuality of a harrasser provides an inference of sexual desire for a victim of

the same sex.  *See Oncale*, 523 U.S. at 80.  This inference is analogous to the inference made

between opposite-sex parties, and thus does not expand the Title VII framework to encompass

discrimination based on sexual orientation.  *See id.*

Under *Oncale*, Title VII extends to Ellsworth's same-sex sexual harassment claim

because he alleges harassment based on sex, not sexual orientation, and thus asserts that the

harassment was based on his status as a member of a protected class.[8]  *See id.* at 80-81.

Furthermore, Ellsworth is not basing his claim on a gender conformity or sex-stereotyping

argument, and thus *Vickers* does not prohibit his claim, as it is not simply a sexual orientation

discrimination claim masked as a sex-stereotyping claim.  *See Vickers*, 453 F.3d at 763-64.

Further, because there is no dispute that all of the alleged harassers in the present case were

homosexual, there is an inference that their conduct was based on sexual desire, and thus, sex.

*See Oncale*, 523 U.S. at 80; *Harbert-Yeargin*, 266 F.3d at 522.  This inference is not rebutted, as

there is no evidence that the harassers acted similarly toward female employees.  Ellsworth's

---

[8]Ashley Furniture cites four same-sex suits in which the Sixth Circuit rejected claims "even though the allegations concerned harassment that was sexual in nature."  (Docket No. 18 at 8.)  However, these cases actually support Ellsworth's claim, or, like *Vickers*, involve the separate issue of sex-stereotyping.  *See King v. Super Serv., Inc.*, 68 F. App'x 659, 663-64 (6th Cir. 2003) (finding that there was no sexual harassment because there was no indication that the defendant was homosexual, that there was general hostility to men in the workplace, or that women were treated comparatively better than men); *Bibby*, 260 F.3d at 264 (stating that harassment did not fit into any of the three *Oncale* categories); *Harbert-Yeargin*, 266 F.3d at 519-23 (finding no inference of sexual desire and no evidence of a general hostility towards one gender in the workplace); *Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1085 (7th Cir. 2000) (finding that basis of harassment was perceived homosexuality, rather than sex).

deposition testimony, read in full, alleges sexual comments and propositions occurring both before and after he disclosed his heterosexuality.[9] Thus, the court may infer that Ellsworth's alleged harassment was based on his sex, rather than on his sexual orientation, and Ashley Furniture is not entitled to summary judgment on these grounds.

Though not raised by Ashley Furniture, the court is compelled to consider whether the sexual harassment experienced by Ellsworth is sufficiently severe or pervasive to support his hostile work environment claim. To establish that the harassment affected a term, condition, or privilege of employment, Ellsworth must demonstrate that the workplace was "permeated with discriminatory intimidation, ridicule, and insult[] that is sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment." *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (citation and quotation omitted). Courts determining whether a hostile work environment exists must look to the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (citing *Harris*, 510 U.S. at 23). While harassment involving an element of physical invasion is more severe, verbal conduct alone can support a hostile work environment claim. *See Black v. Baring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997). However, "[c]omplaints

---

[9]Ashley Furniture's claim that the harassment only occurred after Ellsworth disclosed his heterosexuality is based on a very selective reading of his deposition. There is no genuine issue of fact as to whether Ellsworth alleges harassment based on sexual orientation. He testified, "their sexual comments or propositions being made from, I'd say, a month and a half after the time I got there until the time that I left," and "I let them know that I wasn't a homosexual, that I wasn't interested in having sex with them and that I would appreciate it if they quit approaching me in that fashion. And they did not."

attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing," are insufficient to support such a claim. *Faragher*, 524 U.S. at 788 (quotation omitted). Words that merely have sexual content or connotations are also insufficient for a valid claim. *See Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008).

In *Black*, the Sixth Circuit considered whether harassing verbal conduct established a hostile work environment claim. In that case, the plaintiff alleged comments that occurred during eight meetings over four months. *See Black*, 104 F.3d at 823. The comments included group banter about land for sale next to a Hooters Restaurant, references to the plaintiff as a "broad," and jokes about an individual's last name, which was pronounced "bosom." *Id.* at 823-24. The comments that were directed at the plaintiff included innuendo about "sticky buns" and the defendant corporation's president's remark, "weren't you there [at a biker bar] Saturday night dancing on the tables?" *Id.* The court noted that the comments occurred at eight biweekly meetings, but focused on the relative severity of the conduct rather than its pervasiveness. *See id.* at 824. The court concluded, in light of "the totality of the circumstances," that "the conduct does not appear to have been more than 'merely offensive," noting that, while not determinative, the fact that most of the comments were not directed at the plaintiff contributed to the conclusion that the harassment was not severe. *Id.* at 826. The court therefore overturned a jury verdict for the plaintiff, holding that the conduct was not objectively severe or pervasive enough to support her hostile environment claim. *Id.* at 827.

Subsequently, in *Abeita v. Transamerican Mailing, Inc.*, 159 F.3d 246, 248-50 (6th Cir. 1998), the Sixth Circuit again considered whether verbal harassment established a valid hostile

work environment claim.  In *Abeita*, in contrast to its ruling in *Black*, the court ruled that a magazine company supervisor's pervasive sexual comments over seven years were sufficient to support a Title VII claim.  In that case, the plaintiff alleged that her supervisor described his desire to have sex with female employees or models that he arranged to have photographed in his presence.  Only one of the alleged comments was about the plaintiff – the supervisor's speculation to the plaintiff about the color of her underwear.  *Id.* at 248.  The supervisor also made multiple comments about the weights of female employees, but not about the weights of male employees.  *Id.* at 249.  The court reversed the district court's grant of summary judgment to the defendant, ruling that the comments, while "approximately equal *severity* to those found in *Black*," "were commonplace, ongoing, and continual," which established pervasiveness sufficient to support a Title VII claim.  *Id.* at 252 (emphasis in original).

In *Williams v. General Motors Corp.*, 187 F.3d 553, 559, 563 (6th Cir. 1999), the Sixth Circuit emphasized the importance of the totality of the circumstance approach.  "[E]ven where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effects of such incidents may result in a Title VII violation."  *Id.* at 563.  In *Williams*, the court considered, in the aggregate, fifteen incidents of predominantly verbal sexual harassment that occurred over one year, including the plaintiff's allegations about a supervisor's sexual invitation ("You can rub up against me anytime") and speculation on the plaintiff's sexual performance ("You would kill me. . . . I don't know if I can handle it, but I'd die with a smile on my face").  *Id*. at 559.  Additionally, the plaintiff reported co-workers' comments, including "Hey, slut," and more general derogatory remarks about women in the workplace.  *Id*.  The court found that the supervisor's remarks "were not merely crude, offensive, and humiliating, but also

14

contained an element of physical invasion," in that the supervisor had put his face against the plaintiff's face and his arm around her neck. *Id*. at 563. The court stated that the "Hey, slut" comment was more than "merely foul language in the workplace . . . [and] could be viewed by a jury as humiliating and fundamentally offensive to any woman in that work environment . . . ." *Id.* (quotation omitted). The Sixth Circuit further ruled that "the district court disaggregated the plaintiff's claims, contrary to the Supreme Court's 'totality of circumstances' directives, which robbed the incidents of their cumulative effect" and reversed the grant of summary judgment to the defendant. *Id*. at 561, 564.

Together, *Black, Abeita,* and *Williams* demonstrate the importance of the totality of circumstances approach in considering whether a plaintiff can establish a hostile work environment claim. *See Burnett v. Tyco Corp.*, 203 F.3d 980, 984 (6th Cir. 2000) (finding that the plaintiff's allegations did not support a hostile working environment claim because they were less severe or pervasive than those in *Black*, *Abeita*, and *Williams*). The verbal conduct of which Ellsworth complains goes beyond workplace teasing or off-color jokes and is closer in nature to the conduct in *Abeita* or *Williams* than to the conduct in *Black*. Along with multiple propositions for sex, the alleged commentary included frequent, open speculation about Ellsworth's genitalia and sexual performance, akin to the direct propositions and sexual comments at issue in *Williams*. In addition, the fact that the comments frequently were directed at Ellsworth renders them more severe than more generalized comments would have been. Further, the commentary was also pervasive. Ellsworth reports being propositioned for sex between six and eight times throughout a six-month period during which he worked at Ashley Furniture. Ellsworth also alleges that sexual comments were made on a daily basis and were

specifically directed to or about Ellsworth three to four times each week. Like the conduct in *Abeita*, the conduct that Ellsworth alleges was continuous, ongoing, and commonplace. Therefore, taking his allegations in the aggregate, Ellsworth has, at the very least, established that a genuine issue of fact exists as to whether he experienced sex-based harassment sufficiently severe or pervasive to support his Title VII hostile work environment claim.

   B.   *Racial Harassment*

With respect to Ellsworth's race-based harassment claim, Ashley Furniture contends that Ellsworth cannot establish that the harassment was sufficiently severe or pervasive to establish a hostile work environment.

   A working environment dominated by continuing racial slurs may constitute a violation of Title VII. *See Jackson v.Quanex Corp.*, 191 F.3d 647, 662 (6th Cir. 1999) (citing *Torres v. Oakland*, 758 F.2d 147, 151 (6th Cir. 1985), *and Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1257 (8th Cir. 1981)). However, "[a]s the Supreme Court has long recognized, occasional utterances of racial epithets, although they engender offensive feelings in an employee, would not sufficiently alter the terms and conditions of employment to violate Title VII." *Allen v. Mich. Dep't of Corr.*, 165 F.3d 405, 415 (6th Cir. 1999) (citing *Faragher*, 524 U.S. at 786).


   Ellsworth's allegations of racial harassment do not support a Title VII claim for a racially discriminatory hostile work environment. Ellsworth claims that he encountered racial harassment to the extent that (1) Young repeatedly called Ellsworth the "n-word," and, in one instance, accompanied the epithet with a physical shove and verbal threats as a result of Young's jealousy over Ellsworth's sales success; (2) Adcock laughed at employees' racial comments and

referred to some furniture as "ghetto" and "meant for people in the 'hood"; and (3) the sexual harassment that Ellsworth experienced often involved racial stereotypes and the use of the "n-word."  However, Young's use of the "n-word" and Adcock's offensive sales comments are better classified as relatively minor and isolated incidents of racial slurs or offensive jokes than severe or pervasive harassment.  Additionally, the stereotyped sexual remarks, including Ftacek's use of the "n-word," are racially offensive but are better addressed in the context of sexual harassment.  These incidents, in combination, are insufficiently severe or pervasive to maintain a Title VII claim, and summary judgment is, therefore, appropriate with respect to this claim.

However, even though the racial harassment that Ellsworth experienced was not severe or pervasive enough to support a hostile working environment claim based exclusively on race, it acted to augment the overall hostile environment of the workplace.  *See Hafford*, 183 F.3d at 515.  In *Hafford*, the Sixth Circuit discussed a plaintiff's harassment by coworkers on both religious and racial grounds, where the religion-based harassment failed to support a Title VII claim but the race-based harassment supported such a claim.  *Id.*

> The theory of a hostile-environment claim is that the cumulative effect of ongoing harassment is abusive.  It would not be right to require a judgment against [plaintiff] if the sum of all of the harassment he experienced was abusive, but the incidents could be separated into several categories, with no one category containing enough incidents to amount to "pervasive" harassment.  Although there is enough evidence of racial harassment for that claim to stand on its own, the district court should allow at trial for consideration of the possibility that the racial animus of [plaintiff]'s co-workers was augmented by their bias against his religion.

*Id.* at 514-15 (citing *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415-17 (10th Cir. 1987)).

Similarly, the Tenth Circuit ruled that "incidents of racial harassment which may, by themselves, be insufficient to support . . . a hostile work environment claim can be combined with incidents of sexual harassment to prove a pervasive pattern of discriminatory harassment in violation of Title VII." *Hicks*, 833 F.2d at 1415. Thus, while Ellsworth's claim of a racially hostile work environment falls short of the Title VII threshold, the racial harassment he experienced can be used in considering the intensity of the sex-based harassment and the overall pattern of behavior that contributed to a hostile working environment.

## III.    Retaliation Claim

In the Complaint, Ellsworth asserts that he was subject to retaliation to the extent that Ashley Furniture "[took] away his sales" and "failed to pay commissions that were due." (Docket No. 1 ¶¶ 8-9.) To establish a *prima facie* case of unlawful retaliation, Ellsworth must demonstrate that (1) he engaged in activity that Title VII protects; (2) Ashley Furniture knew that he engaged in this protected activity; (3) Ashley Furniture took an employment action against him that a reasonable employee would have found to be materially adverse; and (4) a causal connection existed between the protected activity and the adverse employment action. *See Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 736 (6th Cir. 2006) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

Ashley Furniture argues, however, that the after-acquired evidence rule bars Ellsworth's retaliation claim because Ashley Furniture would never have hired or retained Ellsworth had it known about his criminal history, which included an armed robbery conviction.[10] In

_____

[10]It is undisputed that, on his employment application and background investigation authorization, Ellsworth answered "no" to the inquiry of whether he had ever plead guilty, no contest, or been convicted of any crime. He also left blank sections requesting information

discrimination cases, when an employer can demonstrate that, had it known of an employee's severe wrongdoing, it would have been justified in terminating an employee who otherwise had been terminated unlawfully, the after-acquired evidence rule limits the remedies available to an employee. *McKennon v. Nashville Banner Publ. Co.*, 513 U.S. 352, 362-63 (1995). In *McKennon*, the Supreme Court ruled that the after-acquired evidence rule does not provide a complete defense to termination claims brought under the Age Discrimination in Employment Act ("ADEA"), an anti-discrimination statute that shares "common substantive features" as well as a "common purpose" with Title VII.[11] *See id.* at 358; s*ee also Wehr v. Ryan's Family Steak Houses, Inc.*, 49 F.3d 1150, 1153 (6th Cir. 1995) (applying *McKennon* to Title VII case). "The private litigant who seeks redress for his or her injuries vindicates both the deterrence and the compensation objectives of [federal anti-discrimination statutes]. . . . It would not accord with this scheme if after-acquired evidence of wrongdoing that would have resulted in termination operates, in every instance, to bar all relief for an earlier violation of the Act[s]." *McKennon*, 513 U.S. at 359. As such, *McKennon* places some limitations on the application of the after-acquired evidence rule in Title VII suits.

However, the court need not determine the extent to which the after-acquired evidence rule applies to Ellsworth's retaliation claim, because Ellsworth has failed to establish the

---

regarding any affirmative conviction. To the contrary, however, Ellsworth had previously been incarcerated for eleven years because of an armed robbery conviction. In addition, Ellsworth had been convicted of or had plead guilty to crimes including obstruction of justice, assault on a police officer, and possession of a controlled substance.

[11]Ashley Furniture heavily relies on pre-*McKennon* cases, including *Johnson v. Honeywell Info. Sys., Inc.*, 955 F.2d 509 (6th Cir. 1992), which the Supreme Court expressly disapproved in *McKennon*, for the proposition that the after-acquired evidence rule establishes a complete bar to a discrimination claim.

necessary causal connection to maintain this claim.  The only potential causal connection that Ellsworth alleges is that Ross withheld Ellsworth's commissions at some point after Ellsworth began complaining more frequently about the sexual and racial harassment he experienced.  Although temporal proximity between protected conduct and an adverse employment action may "be coupled with other indicia of retaliatory conduct" to prove causation, temporal proximity, by itself, "is insufficient to find a causal connection."  *Randolph*, 453 F.3d at 737.  Ellsworth has not presented any other evidence of a causal connection and, thus, fails to meet the causation requirement for his retaliation claim.  Summary judgment for the defendant is therefore appropriate with respect to this claim.

## IV.    Breach of Contract Claim

Finally, Ellsworth claims that Ashley Furniture breached the employment agreement by "failing to pay commissions that were due."  (Docket No. 1 ¶ 10.)  Ashley Furniture argues that the after-acquired evidence rule bars Ellsworth's breach of contract claim.

An employer may use after-acquired evidence of employee misconduct in defense of a breach of contract claim for future wages if the employer can prove that it would have fired the employee had it known of the misconduct.  *Teter v. Republic Parking Sys., Inc.*, 181 S.W.3d 330, 339 (Tenn. 2005).  In *Teter*, the Tennessee Supreme Court ruled that an employer could refuse to pay an employee's severance pay when the employer discovered, post-termination, that the employee had been engaged in gross misconduct that would have justified termination without severance pay.  *See id.* at 339.  "We agree that in a breach of contract case, after-acquired evidence of employee misconduct is a defense to a breach of contract action for wages and benefits lost as a result of the discharge if the employer can demonstrate that it would have fired

the employee had it known of the misconduct." *Id.* at 340 (quotation omitted). The court distinguished the application of the after-acquired evidence rule to claims arising from a breach of contract claim from claims "which implicate major public policy concerns" – such as those arising under Title VII. *Id* at n.2 (citing *McKennon*, 513 U.S. at 362-63).

Ashley Furniture may invoke the after-acquired evidence rule as a defense to Ellsworth's claim for commissions payable after he was terminated. The Master Commission Agreement and Furniture Protection Bonus Plan warn that commissions are only payable to sales associates who are still employed and in good standing at the time of commission disbursement. Further, Ellsworth's employment application provided that false information "may result in discharge," and Gallatin's sworn affidavit states that employees who misrepresent material aspects of their applications are terminated, as Ellsworth would have been if Ashley Furniture had become aware of his criminal history and the fact that he had misrepresented this on his employment application. Thus, Ellsworth's criminal history and his misstatements on his application serve as after-acquired evidence barring his claim for commissions withheld after his termination.

However, Ashley Furniture may not invoke the after-acquired evidence rule with respect to Ellsworth's claim for commissions payable prior to his termination, as Ellsworth has alleged that Ashley Furniture withheld commissions while he was still employed. "The after-acquired evidence doctrine has its foundation in the logic that an employee cannot complain after being wrongfully discharged because the individual is no worse off than he or she would have been had the truth of his or her misconduct been present at the outset." *Crawford Rehab. Serv., Inc. v. Weissman*, 938 P.2d 540, 547 (Colo. 1997). Thus, the after-acquired evidence rule may be applied to future wages, including commissions dispersed after an employee's resignation, but is

not applicable to claims for wages previously earned, including commissions withheld prior to an employee's termination. If Ashley Furniture retains commissions payable prior to Ellsworth's resignation, Ellsworth will be in a worse position than if he had been terminated earlier, and Ashley Furniture will be unjustly enriched by Ellsworth's sales work. Thus, summary judgment will not be granted for the defendant with respect to this issue.

## CONCLUSION

For the reasons discussed herein, the defendant's Motion for Summary Judgment will be granted with respect to Ellsworth's race-based hostile work environment and retaliation claims, as well as his breach of contract claim regarding commissions payable after his termination, and will be denied with respect to Ellsworth's sex-based hostile work environment claim and his breach of contract claim regarding commissions payable prior to his termination.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge